**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF 1915 18th STREET, NW, 2nd FLOOR WASHINGTON, D.C. 20009 | Case No. |
|---|---|

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Joseph Hoang, Special Agent of the Federal Bureau of Investigation (FBI), Washington (D.C.) Field Office (WFO), Northern Virginia Resident Agency (NVRA), being duly sworn, depose and state the following:

## INTRODUCTION

1. This affidavit is submitted in support of an application for a search warrant for the premises located at 1915 18th Street, NW, 2nd Floor, Washington, D.C. 20009 (hereinafter the "**SUBJECT PREMISES**" more fully described in Attachment A incorporated herein). The facts and information contained in this affidavit are based on my personal knowledge of this investigation, information obtained from federal and state law enforcement officers, and information that has been related to me by records and documents gathered during this investigation.

2. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government. The inferences and conclusions I draw from the evidence included in this affidavit are what I believe based on my training, experience, and knowledge of the investigation.

## AGENT BACKGROUND

3.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

4.      I have been a Special Agent with the FBI since December 2010.  I am currently assigned to the FBI's Washington Field Office, Northern Virginia Resident Agency, and have been so assigned since August 2012.  Since that time, I have been assigned to a Transnational Organized Crime squad where my primary duties include, but are not limited to, the enforcement of federal laws related to crimes committed by transnational organizations and other criminal street gang organizations.  While assigned to this squad, I have participated in federal and state investigations of criminal organizations, gang members, gang associates, and others involved in illegal distribution of controlled substances, illegal possession and illegal use of firearms, interstate transportation of stolen property, money laundering, and other related criminal offenses.

5.      During the course of my employment with the FBI, I have received comprehensive formal instruction on such topics such as drug identification; money laundering techniques; patterns of drug trafficking and conspiracies; the exploitation of narcotics traffickers' telecommunications devices; criminal law; surveillance; and other investigative techniques. I have initiated and assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics as well as the use and transportation of weapons in support of narcotics distribution activities.

**BACKGROUND OF INVESTIGATION**

6. In and around September 2013, a source of information (SI) provided information regarding the drug trafficking activities of Cuong Quoc HUYNH. The information provided by SI has proved reliable regarding the narcotics trafficking activities of HUYNH. For the purpose of this affidavit, SI will be referred to in the masculine gender regardless of whether SI is in fact male or female.

a. Specifically, SI was a former Asian Dragon Family (ADF) gang member and left the gang when leadership of the gang was handed to HUYNH. According to SI, once HUYNH took over leadership of ADF, the gang began to sell marijuana, which is a Schedule I controlled substance. SI stated that the marijuana comes from HUYNH and he (HUYNH) distributes it to Thang Duc VAN and other ADF members to sell. SI is friends with HUYNH and many of the ADF members. On several occasions, SI delivered marijuana on behalf of HUYNH. SI delivered a pound of marijuana approximately three (3) to four (4) times for HUYNH. HUYNH would pay SI approximately $100 for every delivery SI made. SI would pick up approximately a pound of marijuana from VAN's house in Washington, D.C., and deliver it to Virginia or Maryland. SI believed that the marijuana came from California or Canada and that it is of good quality. Agents showed a photo of HUYNH to SI in 2013, and SI identified the person depicted in the photo as the person he knows as HUYNH.

b. SI has a criminal history that includes felony possession of a schedule I or II narcotic in Fairfax, Virginia in 2011, which was nolle prossed, and a felony possession of a controlled substance in Falls Church, Virginia in 2011.

c. SI's information regarding HUYNH has been corroborated through physical surveillance and telephone record analysis. To my knowledge, SI's information has never been

found to be intentionally false or misleading.

d. For these reasons, I consider SI to be reliable.

7. In and around March 2015, a confidential source (CS) began to provide information regarding the narcotics trafficking activities of HUYNH.[1] CS is a joint FBI/HSI source currently working with the FBI. For the purpose of this affidavit, CS will be referred to in the masculine gender regardless of whether CS is in fact male or female.

a. Specifically, CS provided information that HUYNH was trafficking quantities of marijuana. In the past, CS had sold marijuana for HUYNH but stopped selling marijuana because CS could not develop enough clientele. HUYNH sold CS one (1) pound of marijuana for approximately $3,400 and CS would in turn break the marijuana down to ounce packages and sell them for $300 to $350 an ounce. When speaking on the telephone, CS stated that HUYNH uses coded language and the code varies depending on the subject they may be talking about at the time. Examples of some code words are "brake pads" (meaning marijuana) and "paperwork" (meaning money). CS stated that HUYNH launders the money from the proceeds of the distribution of narcotics through the two businesses, MY VAPEZ and ANH DAO NAILS, located in Waldorf, Maryland. CS believes that the narcotics distribution business is controlled by HUYNH and that HUYNH's boys, ADF gang members, all work for HUYNH. CS has made controlled and monitored purchases of marijuana from HUYNH at the direction and control of law enforcement. Agents showed a photo of HUYNH to CS in 2015, and CS identified the person depicted in the photo as the person he knows as HUYNH. Your affiant's investigation has established that CS has known HUYNH at least 10 years at this point.

1 This affidavit discusses several confidential sources whose information law enforcement has found to be reliable, credible, and often corroborated by other sources or events. Each confidential source is referred to in the masculine gender, regardless of their true gender, and they are labeled by "CS" and a corresponding number. The numbers do not carry any significance and do not necessarily appear sequentially in this affidavit.

      b. CS has a criminal history that includes convictions for two driving while intoxicated (DWI) offenses in Fairfax, Virginia in 2009 and 2014 (misdemeanors). CS also has a pending DWI charge currently in Virginia Beach, Virginia. CS has made statements against his penal interest and provided law enforcement with information regarding the drug trafficking activities of HUYNH and HUYNH's co-conspirators in hopes that he will receive consideration for his own criminal conduct in the future. CS has not been promised anything in exchange for his information and cooperation. CS has not received monetary compensation in return for his cooperation with law enforcement.

c. CS's information regarding HUYNH has been corroborated through physical surveillance, controlled drug purchases, consensually recorded telephone calls with HUYNH, and telephone record analysis. To my knowledge, as to the actions described in this affidavit, CS acted exclusively at the direction of law enforcement. To my knowledge, CS's information has never been found to be intentionally false or misleading.

d. For these reasons, I consider CS to be reliable.

8. The investigation revealed that HUYNH is the leader of the ADF and involved in the distribution of marijuana within the jurisdiction of the Eastern District of Virginia and its surrounding areas. Several controlled purchases of marijuana (totaling approximately six (6) pounds) have been made from HUYNH and his co-conspirators by law enforcement. Utilizing a confidential source, agents have conducted monitored telephone calls to HUYNH during which marijuana purchases are discussed. Source reporting indicated that HUYNH received an undetermined amount of marijuana from California through the mail system or truck deliveries. HUYNH has a criminal history that includes convictions for the following: embezzlement (felony), identity theft (misdemeanor), carrying a concealed weapon (misdemeanor), assault and

battery (misdemeanor), trespassing (misdemeanor), driving under the influence of alcohol (misdemeanor), possession with intent to distribute marijuana (felony), and the transportation of marijuana to Virginia (felony). [years of conviction?]

9. The investigation has established that HUYNH continues to engage in illegal activities for profit. Specifically HUYNH is involved in the distribution of marijuana within the Eastern District of Virginia, District of Columbia, and elsewhere. The majority of his business comes from supplying pound quantities of marijuana to co-conspirators who are themselves street-level dealers and/or who supply other street-level dealers. HUYNH typically gets pound quantities, between 60 and 70 pounds, of marijuana shipped to HUYNH on a weekly to bi-weekly basis. HUYNH then directly resells the marijuana to his co-conspirators who further re-distribute the marijuana.

10. Through the course of this investigation your affiant believes NGUYEN utilizes the proceeds from the marijuana in demand at the present time and reinvests it in other marijuana in demand at a later time in order to maximize profit for his organization. Based on my training and experience, drug traffickers typically reinvest proceeds from present drug deals into future drug purchases to further their criminal enterprise ventures. The investigation also revealed that HUYNH's criminal enterprise is made up of close personal friends, Victoria Van NGUYEN, VAN, Michael Francis NGO, and NIKCO Van Nguyen. This group is responsible for collection, stash locations, transportation, and the re-distribution of marijuana for the criminal enterprise.

11. NGUYEN: As set forth in more detail below, NGUYEN has been identified through source information as HUYNH's girlfriend and a co-conspirator in HUYNH's criminal enterprise. Sources of information have also stated that HUYNH buys businesses and property under other people's name. Through Department of Motor Vehicle checks and financial records,

the majority of the vehicles used by this criminal enterprise are registered to NGUYEN and the business where the ADF members hang out at, MY VAPEZ, which is also registered to NGUYEN. It is further believed that the criminal enterprise used this business to launder its illegal proceeds from the distribution of marijuana. NGUYEN also accompanied HUYNH to Arlington, Virginia to collect a $10,200 marijuana debt that was owed by a CS. During this meeting in 2015, NGUYEN collected the money owed from the CS and drove the proceeds back to Waldorf, Maryland, with HUYNH.

12. NIKCO: As set forth in more detail below, NIKCO has been identified through source information as an ADF gang member and involved in the distribution of marijuana within the jurisdiction of EDVA and its surrounding areas. Four (4) of NIKCO's fingerprint were found on the plastic bags holding the marijuana that was delivered to CS during a control buy on May 8, 2015.

13. Law enforcement has used many methods to investigate the conspiracies. These include interviews of confidential sources, consensually monitored phone calls, analysis of toll records and other telephone records, examination of financial records, and physical surveillance. Wherever in this affidavit I discuss information resulting from physical surveillance conducted in this investigation, that information, except where otherwise indicated, does not set forth my own personal observations, but rather that which has been provided directly or indirectly to me through other law enforcement officers who made such observations.

14. Controlled purchases of marijuana were made by a confidential source.[2] Prior to each controlled purchase involving a confidential source, the confidential source was searched

2 Based on the investigation and training and experience of law enforcement, the controlled purchases and seizures referenced within this affidavit are suspected to be controlled substances. Though some field tests were performed, because agents are awaiting the results of analyses conducted of all the substances by forensic chemists with the DEA and other agencies, all references within this affidavit to controlled substances in law enforcement's

prior to and following the transaction to ensure that no contraband was present, with negative results each time. After each transaction, all contraband and evidence purchased, as well as any remaining monies, were relinquished by the confidential source to law enforcement. To date, two (2) controlled purchases of marijuana, totaling approximately six (6) pounds of marijuana, were made from HUYNH and his co-conspirators by law enforcement. A control payment of $10,200 was also made to HUYNH and his co-conspirator in Arlington, Virginia.

15. During the evening hours of April 15, 2014, CS called HUYNH at cellular telephone number 202-910-7265 and arranged the meeting location for the purchase of narcotics. During the conversation, CS ordered 2 “brake pads” (being code for 2 pounds of marijuana) and set a meeting location in Centreville, Virginia. CS advised agents that from past transactions the high grade marijuana was sold to CS for $3,400 per pound. CS further stated that HUYNH sold a portion of the marijuana to CS on credit and that CS would only have to pay for a portion of the marijuana. Agents then directed CS to pay for half of the marijuana and the second half would be paid at a later time. CS further stated that HUYNH would never deliver the marijuana himself and that one of the ADF members usually delivered the marijuana on behalf of HUYNH. CS advised agents that CS would get a call from HUYNH to tell CS who was coming or CS would receive a call from the person who was tasked to deliver the marijuana when they were on their way to meet with CS.

16. On April 16, 2014, an operation for a controlled buy of narcotics from the ADF was conducted by the Federal Bureau of Investigation (FBI). CS was utilized to purchase the narcotics from ADF. At approximately 10:25 a.m., CS called HUYNH at telephone number 202-

possession should be read as suspected controlled substances. Additionally, many of the stated quantities of the suspected controlled substances are based on estimates made by law enforcement in and around the time of the respective seizures of those substances; therefore, they are not final and are subject to revision by the forensic chemists.

910-7265. During the conversation, CS advised HUYNH that CS wanted one (1) more pound of marijuana because CS was able to obtain more money. CS advised HUYNH that CS had 51 (meaning $5,100) for HUYNH. At approximately 11:20 a.m., CS missed a telephone call from telephone number 202-830-4178. At approximately 11:25 a.m., CS called the telephone number back and a person known to CS as VAN picked up the telephone call. VAN advised CS that VAN would be at the meeting location around 12:00 p.m. or so. At approximately 12:24 p.m., CS received a text from VAN advising CS that VAN would be there in 10 minutes. At approximately 12:29 p.m., surveillance teams staged at the Sully Station Shopping strip (Chantilly, Virginia) observed a black Acura Integra with Virginia registration VDT 6240 arrived. Agents observed CS get into the passenger side of the vehicle. Agents observed VAN driving the vehicle. The vehicle then parked in an empty parking spot. Moments later, agents observed VAN, wearing red pants, white shirt, sunglasses and red baseball cap, get out of the vehicle and go to the rear of the vehicle. VAN then proceeded to open the trunk and pulled out a birthday bag with an orange tiger and handed the bag to CS. The two shook hands, completing the deal and VAN closed the trunk. At approximately 12:37 p.m., CS walked away from VAN. Moments later VAN got into the vehicle, backed up the car, and proceeded to leave the parking lot.

17. Agents then met up with CS at a predetermined location. The evidence was taken into custody by your affiant. Upon further inspection, within the birthday bag and under two (2) Safeway shopping bags were three (3) individually air vacuumed sealed bags. Inside the vacuum sealed bags were a green leafy substance. The evidence field-tested positive for the presence of marijuana and weighed approximately 1,504.1 grams (3 pounds). While being debriefed CS advised agents that once CS got into the vehicle, CS handed the $5,100 to VAN.

18. During the evening hours on May 5, 2015, CS called HUYNH at telephone number 202-910-7265 and had a conversation. During the conversation, HUYNH questioned if CS acquired all the "paper" (code for money) for the deal on April 16, 2015. HUYNH was trying to collect all the "paperwork" so that HUYNH could pay his "people" (meaning source of supply).

19. During the evening hours of May 6, 2015, CS had several conversations with HUYNH at the aforementioned telephone number. During the conversations, CS advised HUYNH that CS had all the "paperwork" for the last round and arranged the meeting location for the purchase of an additional three (3) pounds of marijuana. CS would pay the remaining amount of approximately $5,100 owed for the deal on May 16, 2015, and would receive the 3 pounds of marijuana on credit. CS would then pay the full amount, approximately $10,200, for the 3 pounds of marijuana in the next week or so to HUYNH. HUYNH agreed on the terms and advised CS that HUYNH would send someone tomorrow to complete the transaction.

20. On May 7, 2015, at approximately 10:37 a.m., CS called HUYNH at the aforementioned telephone number and had a conversation. During the conversation, HUYNH advised CS that HUYNH would wake up the person delivering the marijuana. At approximately 11:37 a.m., CS received a telephone call from telephone number 571-438-3540, known to CS as the telephone number used by NGO. During the conversation, NGO advised CS that NGO did not have anything on him because NGO's father, no name given, had taken NGO's vehicle and that the "shoes" (code for marijuana) were in the vehicle. NGO then advised CS that NGO would meet up with CS tomorrow morning to complete the transaction. At approximately 11:47 a.m., CS called HUYNH and advised HUYNH that the transaction would not go down today. HUYNH advised CS that HUYNH would have NGO meet with CS tomorrow morning at 10:30 a.m. to complete the transaction.

21.  On May 8, 2015, at approximately 9:20 a.m., surveillance was set at NGO's residence located at 6545 Kerns Road. At approximately 9:57 a.m., CS called NGO at telephone number 571-438-3540 and had a conversation. During the conversation, NGO advised CS that NGO was getting ready to go meet with CS and for CS to text NGO the address for the meeting location. At approximately 10:14 a.m., CS called NGO at the aforementioned telephone number and had a conversation. During the conversation, NGO advised CS that NGO was on his way. At approximately 10:30 a.m., surveillance observed a silver BMW with Virginia registration ACA 8849 and driven by NGO depart from the residence at Kerns Road. Surveillance continued to follow this vehicle to the Sully Station shopping strip. At approximately 10:34 a.m., CS called NGO at the aforementioned telephone number and had a conversation. During the conversation NGO advised CS that NGO was approximately 15 to 20 minutes from the meeting location.

22.  On May 8, 2015, at approximately 11:08 a.m., surveillance teams at the Sully Station shopping strip (Chantilly, Virginia) observed NGO arrive in the silver BMW. NGO drove up to CS and CS got into the passenger side of the vehicle. NGO then proceeded to an empty parking spot and parked the vehicle. Surveillance observed NGO hand CS a green gift bag from the backseat area of the vehicle. The two had then had a short conversation. At approximately 11:10 a.m., CS was observed getting out of the passenger side of the vehicle with a green gift bag in CS's hand. NGO then began to back up the vehicle, stopped for a moment, had another conversation with CS, and then proceeded to drive off.

23.  Agents then met up with CS at a predetermined location. The evidence was taken into custody your affiant. Upon further inspection, within the green gift bag under two (2) tissues (one orange and the other was colorful balloons) were three 3 individually air vacuumed sealed bags. Inside the vacuum sealed bag was a green leafy substance. The evidence field-tested positive

for the presence of marijuana and weighed approximately 1,500 grams (3 pounds). While being debriefed, CS advised agents that once CS got into the vehicle, CS handed the $5,100 to NGO. NGO took the money and put it into the glove compartment of the vehicle. NGO then reached behind the driver's side and grabbed the green gift bag and handed it to CS. CS then had a short conversation with NGO. During the conversation, NGO advised CS that NGO was going to do more work. CS did not see any other gift bags in the backseat of the vehicle, but believed that there may be some gift bags in the trunk of the vehicle.

24.     During the morning hours on May 19, 2015, CS called HUYNH at telephone number 202-910-7265 and had a short conversation. During the conversation, CS arranged a meeting date of May 21, 2015 at 12:00 p.m. for CHS #1 and HUYNH to meet and complete the marijuana transaction for the May 8, 2015 deal.

25.     On May 21, 2015, an operation to pay $10,200 for 3 pounds of marijuana purchased from HUYNH on May 8, 2015 was conducted by agents. At approximately 10:48 a.m., CS called HUYNH at the aforementioned telephone number and had a short conversation. During the conversation, HUYNH advised CS that HUYNH was getting ready to meet with CS and that HUYNH would probably make it by 12:30 p.m. At approximately 12:33 p.m., CS called HUYNH on the aforementioned telephone number and had a short conversation. During the conversation, HUYNH advised CS that HUYNH was about 30 minutes away and for CS to text HUYNH the address.

26.     At approximately 1:25 p.m., surveillance observed a black Lexus with Virginia registration VEG 2567 arrive in front of the Rustico restaurant in Arlington, Virginia. Surveillance observed HUYNH, wearing black jeans, a black shirt and a black baseball cap, get out from the front passenger side of the vehicle and enter the restaurant. The black Lexus then drove off and

parked on the side of road on Quincy Street. Surveillance observed NGUYEN, wearing all black clothes, black glasses, and black tennis shoes, carrying a large handbag make her way to the restaurant.

27. At approximately 2:08 p.m., CS left the restaurant and met with agents at a predetermined location. While being debriefed, CS stated that CS advised NGUYEN that CS had the cash. At that time, NGUYEN advised CS to "put it in there" and proceeded to unzip the large handbag NGUYEN was carrying. CS proceeded to put the yellow envelope containing $10,200 into the large handbag to complete the marijuana transaction for the May 8, 2015 deal.

28. While CS was being debriefed, surveillance continued on HUYNH and NGUYEN. At approximately 2:24 p.m., surveillance observed HUYNH and NGUYEN depart the restaurant and enter the BUZZ Bakery. At approximately 2:30 p.m., surveillance observe HUYNH and NGUYEN exit the bakery and enter the black Lexus. NGUYEN entered the black Lexus on the driver side and HUYNH entered on the passenger side. Surveillance followed the black Lexus from Arlington, Virginia directly to 3205 High Timber Court in Waldorf, Maryland. HUYNH and NGUYEN arrived at the residence at approximately 3:48 p.m. Surveillance then observed NGUYEN carrying the large handbag and HUYNH both exit the vehicle and enter the residence.

**PROBABLE CAUSE**

29. On November 1, 2018, CS went to SUBJECT PREMISES (1915 18th Street, NW, 2nd Floor, Washington, D.C.) to meet with HUYNH and NGUYEN. CS gained access to the building from NGUYEN's brother, TAYLOR NGUYEN. As CS entered the apartment, CS noticed HUYNH and NGUYEN laying on the bed mats located in the living room area. On the coffee table in front of HUYNH and NGUYEN were four (4) to five (5) stacks of cash consistent with what CS described as money collected from marijuana transactions. The stacks of money

observed by CS were wrapped with rubber bands. CS also noticed miscellaneous high-end jewelry lying next to the cash on the coffee table.

30. While in the apartment, CS also observed a large mason jar filled with marijuana on the ground in the living room area. Next to the mason jar was wrapping paper which CS described as the type of paper used to roll marijuana joints and smoke. CS also observed two (2) large, black pelican cases in the living room area. According to the CS, HUYNH and NGUYEN do not travel enough to use the pelican cases as luggage. The CS further stated that the pelican cases are airtight and watertight and likely used to store marijuana since the pelican cases can conceal the odor of the marijuana. The CS described the pelican cases as being approximately seventy five (75) liters each and able to store between fifteen (15) to twenty (20) pounds of marijuana.

31. Additionally, on numerous occasions CS has observed NGUYEN with a small, black handgun with a light pink slide and/or grip. NGUYEN kept the handgun in her handbag. CS has seen NGUYEN's handbag in the SUBJECT PREMISES.

32. On November 6, 2018, Metropolitan Police Department (MPD) reported that it has received complaints by at least 10 citizens that reside in the vicinity of 1900 block of 18th Street NW, between T Street and Willard Street NW, that there is drug dealing going on from the Vietnamese restaurant, as well as from the alley adjacent to the restaurant. Four of these complainants reported that they personally observed hand-to-hand transactions in the alley as well as in the restaurant. They also asserted that there is unusually high vehicular traffic into the restaurant which is not consistent with picking up food.

33. PHO ANH DAO, the Vietnamese restaurant located at 1915 18th Street, NW, Washington, D.C. 20009, is operated by HUYNH, NGUYEN, and NIKCO. Both the restaurant

and the **SUBJECT PREMISES** located upstairs from the restaurant are leased by HUYNH's mother, MUI WITKE. Investigation has shown that HUYNH typically puts his business and residential leases in other people's names to include his mother.

**THE SUBJECT PREMISES**

34. The **SUBJECT PREMISES** is more particularly described as one bedroom condo located on the second floor at 1915 18th Street, NW, Washington, D.C. 20009 above the PHO ANH DAO Restaurant.[3] The building is constructed of red brick and tan stones and has three levels. The first level is the PHO ANH DAO restaurant, the second level is the SUBJECT PREMISES, and the third level is another condo. The SUBJECT PREMISES is located on the left at the top of the first flight of stairs. The door to the SUBJECT PREMISES is tan in color. In addition to the lock on the door handle, there is a deadbolt on the door to the SUBJECT PREMISES.

35. Based on my training and experience, I am aware that:

a. It is common for those involved in the unlawful acquisition, sale, importation, manufacturing, and distribution of controlled substances to generate and maintain, on hand, substantial amounts of United States currency, writings, books, records, owe sheets, receipts, business ledgers, lists, notations, airline tickets, money order transfers and other memoranda and/or papers relating to the transportation, ordering, sales, and distribution of controlled substances and equipment, even though such documents made be in code, to assist in their criminal enterprise and that these materials are created and maintained in much the same way and for the reasons as persons involved in a legitimate business keep similar materials. These

3 Investigation has revealed that around the same time that HUYNH sold ANH DAO NAILS, referenced above, HUYNH opened PHO ANH DAO restaurant. Anh Dao is HUYNH's deceased sister's name. This name is used by HUYNH in his several of his business ventures.

aforementioned books, records, receipts, notes, ledgers, etc. are commonly maintained where the drug traffickers have ready access to them, such as in their residences, businesses, or vehicles. It is also common for these traffickers to maintain the aforementioned items for extended periods of time;

b. Drug traffickers attempt to legitimize the proceeds from the sale of controlled substances by using the services of foreign and domestic banks and various financial institutions, such as money remitters and real estate brokers. Books and papers relating to such efforts, including, but not limited to, cashier checks, money orders, telegrams, letters of credit and ledgers are maintained in the residence, businesses and/or on the property of drug traffickers;

c. Drug traffickers will frequently keep materials memorializing past transactions, the status of accounts (e.g., owe sheets), inventories, income, expense records, books or papers which reflect addresses and telephone numbers of associates, and the like, all of which are pieces of relevant evidence regarding the question of whether one or more persons possess controlled substances for sale, as well as other legal considerations;

d. Drug traffickers oftentimes use their residences or other property associated with the trafficker to acquire, manufacture, package, distribute and sell narcotics. It is common for narcotic dealers to secrete contraband, proceeds, records of sales and transactions, and telephone numbers of their associates in the trafficking organization in secure locations within their residence (including, but not limited to, garage, attic, basement, crawl space, or other such areas therein) or other properties associated with the trafficker, or at the residences or other properties of

      their associates, relatives, and paramours, to include the curtilages as well as vehicles or other structures located on the curtilage of such property, for ready access and to conceal the same from law enforcement; that drug traffickers sometime use storage units rented in a relative's, associate's, or even a fictitious name to secrete contraband, proceeds, records of transactions and telephone numbers of their associates in the drug trafficking organization;

e. Drug traffickers commonly maintain address or telephone numbers in books or papers reflecting names, addresses, and telephone numbers, including, but not limited to, suppliers, couriers, customers, and other associates in the illegal drug trade; that drug traffickers frequently take or cause to be taken photographs or videos of themselves, their associates, their property, and their product such as narcotics, and these traffickers frequently maintain these photographs or videos in their possession and/or in their residence or other property; that drug traffickers sometimes use computers and electronic storage devices to list associates and keep track of debts, product on hand, illicit proceeds, records of transactions, and names, addresses, and telephone numbers of their associates;

f. Drug traffickers very often buy their assets or register their assets, including real property and personal property, such as vehicles, in names or at addresses other than their own to avoid the detection and forfeiture of such assets by government agencies and continue to use these assets and to exercise dominion and control over them;

g. Drug dealers rely on timely telephonic communications to coordinate transactions, such that these dealers use telephones, often cellular telephones, to communicate

amongst associates and co-conspirators in conducting illegal narcotics transactions; that when using cellular telephones, drug dealers sometimes leave voice mail, text messages, or picture messages regarding their illegal activities; that cellular telephones often contain "telephone books" which reflect names, addresses, and/or telephone numbers of their associates in the narcotics trafficking scheme, and narcotics customers; that cellular telephones also often keep track of recent incoming and outgoing telephone numbers; and that the cellular telephones used by drug dealers are sometimes subscribed to fictitious and/or other individuals' or business names; and

h. Drug traffickers will frequently store narcotics and/or firearms in their residences.

**CONCLUSION**

36. Based on the facts outlined above, there is probably cause to believe that from in and around September 2013 through in and around November 2018, HUYNH, NGUYEN, and NIKCO did unlawfully, knowingly, and intentionally combine, conspire, confederate and agree with other persons, both known and unknown, to distribute 800 kilograms or more of a substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Further, there is probable cause to believe that items and records that are evidence of the aforementioned violation are currently contained in the **SUBJECT PREMISES**, a location known as 1915 18th Street, N.W., 2nd Floor, Washington, D.C. 20009. The items and records to be seized are more particularly described in Attachment B incorporated herein.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Respectfully submitted,

_______________________________
Joseph B. Hoang
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this ____ day of November 2018.

__________________________________
The Honorable G. Michael Harvey
United States Magistrate Judge
for the District of Columbia